*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

BEVERLY HAIG,

      Plaintiff-Appellant,

UNPUBLISHED
October 15, 2020

v

No. 348006
Wayne Circuit Court
LC No. 18-101811-DO

ROBERT HAIG,

      Defendant-Appellee.

Before: SWARTZLE, P.J., and JANSEN and BORRELLO, JJ.

PER CURIAM.

Plaintiff appeals as of right a judgment of divorce entered following a bench trial. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

The parties were married in 1988 and have three adult children. During their marriage, the parties purchased the marital home in 1994 (1994 home) with marital funds. After plaintiff's father died in 2006, the home next door to the marital home was purchased, (2006 home) ostensibly for plaintiff's mother. The $40,000 down payment for the purchase of the home came from an asbestos lawsuit involving plaintiff's father. The asbestos lawsuit checks (asbestos money) began coming in 2006 or 2007, and some of the money was used to care for plaintiff's mother. Additionally, asbestos money went into an account for the estate of plaintiff's father, but some of that money was moved to the parties' joint savings account.[1] Before the parties' separation, money received from the asbestos lawsuit was used for the benefit of both plaintiff and defendant, including for vacations, bills, and expenses for their children, though the parties disagreed as to whether asbestos money was used to purchase the truck being driven by defendant. The mortgage

---

[1] It is unclear from the record, and the parties do not set forth in their respective briefs the total sum received by the parties as a result of plaintiff father's asbestos lawsuit. The only finding by the trial court was in its opinion and order stating: "…that at least $613,869.86 was dispersed in total." Neither party seemingly disagrees with this finding.

on the 2006 home was paid with plaintiff's mother's social security money and the difference was paid by the parties from their "asbestos and [] earning pot." The 2006 home was in defendant's name and the parties' son lived there from 2010 to 2013.

In April 2013, the parties separated and plaintiff moved into the 2006 home, where she lived until February 2014. Thereafter, plaintiff moved in with a male friend who later became her boyfriend. When the 2006 home was sold, the net proceeds were approximately $19,000. Plaintiff testified that defendant was willing to let plaintiff have the proceeds because the down payment had come from the asbestos lawsuit.

Plaintiff filed for divorce in 2018. At the time of trial, plaintiff had a Primerica account with a balance of $6,900, a 401K with Prizm Pain Specialist with a balance of $23,552, a TCF account in her name with a balance of $94.26, and a TCF account in the name of her father's estate with a balance of $997.[2] Plaintiff testified that there was no agreement that she and defendant would each keep their own money and she was seeking an equal division of defendant's retirement, an equal division of the equity in the marital residence, and spousal support. Plaintiff denied that there were ever any discussions regarding retirement assets, the homes, or the pension.

Plaintiff, through her physician, Dr. Garb, submitted evidence that she was unable to work. Dr. Garb began seeing plaintiff in 2015 and last saw her on October 23, 2018, diagnosing her with major depression and panic disorder. Apparently, this was not the first time plaintiff was diagnosed with these conditions, as the record revealed that plaintiff had been taking similar medications for six or seven years prior to seeing Dr. Garb. At plaintiff's last visit, Dr. Garb wrote that she had "increased depression, decrease[d] interest level, very overwhelmed[,]" and he suggested that she continue to take her antidepressants. In June 2017, Dr. Garb believed that plaintiff's condition was so severe that he placed her on disability leave. At plaintiff's last visit, Dr. Garb wrote that he believed she was disabled to work indefinitely, as he believed her condition had deteriorated in the last few months of 2018.

In contrast, defendant testified that at the end of 2017, when defendant told plaintiff about an inheritance of roughly $440,000 from his uncle, plaintiff replied that she was going after all the money she could get, and that in order to do so, she was "going to play the crazy card."

Defendant was employed by the City of Detroit Police Department from 1986 to 2011, when he retired and his pension went into pay status. He received $2,700 a month from his pension, and while he was working, earnings went into the National Western Annuity, which had a balance of approximately $230,000 at the time of trial. After defendant retired, he worked as a contract employee from 2011 to 2013 and the money he earned went into the AXA Equitable account which had a balance of $124,683. In 2014, defendant had been taking out $1,000 a month to supplement his pension. Defendant testified that his living expenses and necessities totaled $3,200 a month and he brought in $3,800 a month, including the money taken out of the AXA Equitable account.

---

[2] Plaintiff's sister, Kimberly Neilson, testified that she had loaned plaintiff $12,000 in the previous two years.

Defendant no longer worked because he believed that 27 years was long enough and he cared for his grandchildren approximately 35 hours a week.

In 2017, defendant inherited $440,000 from his uncle, a sum the trial court ruled was not subject to division because it was not part of the marital estate. Defendant used $98,000 of the inheritance to pay off the mortgage on the 1994 home.

Defendant testified that the total asbestos lawsuit distributions before the death of plaintiff's mother was $219,917.76. In 2009, the parties opened an account with $120,000 from the asbestos settlement as a retirement account, however, following their separation, plaintiff removed the $120,000. Defendant did not believe that the asbestos lawsuit money was used to purchase his truck. Rather, he believed that he purchased the truck with money from the lump sum of $41,000 that he received when he retired.

Following a bench trial, the trial court issued an opinion and order regarding the distribution and division of the parties' assets. A judgment of divorce was entered thereafter consistent with the court's opinion and order. On appeal, plaintiff challenges the trial court's division of assets, arguing that the trial court's findings of fact are clearly erroneously and the distribution is inequitable.

## II. ANALYSIS

## A. DEFENDANT'S PENSION

Plaintiff first argues that the trial court clearly erred by finding that defendant's pension was not a marital asset. We agree that the trial court committed legal error by so ruling, however, we find that, following review of the record as a whole, such error does not necessitate reversal for the reasons more fully articulated below.

We review a trial court's findings of fact in a divorce action for clear error. *Woodington v Shokoohi*, 288 Mich App 352, 355; 792 NW2d 63 (2010). "A finding is clearly erroneous if, after a review of the entire record, the reviewing court is left with the definite and firm conviction that a mistake was made." *Id*.

"[T]he trial court's first consideration when dividing property in divorce proceedings is the determination of marital and separate assets." *Reeves v Reeves*, 226 Mich App 490, 493-494; 575 NW2d 1 (1997). "Generally, the marital estate is divided between the parties, and each party takes away from the marriage that party's own separate estate with no invasion by the other party." *Id*. at 494. MCL 552.18(1) provides:

> Any rights in and to vested pension, annuity, or retirement benefits, or accumulated contributions in any pension, annuity, or retirement system, payable to or on behalf of a party on account of service credit accrued by the party during marriage shall be considered part of the marital estate subject to award by the court under this chapter.

"A right to vested pension benefits accrued by a party during the marriage must be considered part of the marital estate subject to award upon divorce." *Pickering v Pickering*, 268 Mich App 1, 7-

8; 706 NW2d 835 (2005). "However, treatment of pension benefits may vary. Depending on the equities and the circumstances, pensions may be distributed through either the property division or the award of alimony." *Id*. at 8. "[A] court can use property of either party to achieve just and reasonable support after taking into consideration the parties' ability to pay, the character and situation of the parties, and the circumstances of the case." *Id*. at 9. "[T]he division of property need not be mathematically equal, but must be equitable." *Id*.

Defendant's pension was clearly marital property because it was accrued by defendant during the marriage. However, the trial court has discretion in its treatment of a pension. See *Pickering*, 268 Mich App at 8. Because the pension was in pay status, we cannot find, on this record, that the trial court abused its discretion by determining that the pension should be treated as defendant's income and awarded only as spousal support. Moreover, the trial court properly considered the situation and circumstances of the parties in determining that plaintiff was not entitled to an award of spousal support, and plaintiff does not challenge that finding.

Rather, in her argument, plaintiff relies solely on MCL 552.18(1) to assert that the trial court provided no legal basis for failing to consider the pension to be a marital asset. To the extent that the trial court believed that the pension was "awardable only as spousal support," this statement, as noted above, was clearly erroneous. The pension was clearly a marital asset subject to award. Nonetheless, what plaintiff's argument fails to consider is that the trial court had discretion in its treatment of the pension. *Pickering*, 268 Mich App at 8.

Additionally, the trial court's findings were based primarily on its factual finding that plaintiff had the ability to earn more than defendant was taking in as income, and on appeal, plaintiff does not challenge that finding. Plaintiff argues only that she is "unemployable," but does not elaborate on this claim. "A party abandons a claim when it fails to make a meaningful argument in support of its position." *Berger v Berger*, 277 Mich App 700, 712; 747 NW2d 336 (2008). The trial court acknowledged that plaintiff's psychiatrist, Dr. Pawan Garb, testified that plaintiff was unable to work, but the trial court found that plaintiff had historically worked despite her condition and could at least obtain part-time employment as a nurse. There was also testimony from defendant, and cited above, wherein plaintiff was alleged to have stated she would "play the crazy card." The trial court believed that plaintiff had chosen not to work after she began receiving the disbursements from her father's asbestos lawsuit, and while we acknowledge that Dr. Garb testified that plaintiff's condition had worsened in the last few months of 2018---testimony which the trial court did not directly address--nonetheless, the trial court's finding was based in part on a credibility determination and, thus, must be given special deference. *Woodington*, 288 Mich App at 355. Following our review of the record evidence in its entirety, we are not left with a definite and firm conviction that the trial court erred by finding that plaintiff could work at least part-time and by awarding defendant his entire pension.

### B. 1994 HOME

Plaintiff next argues that the trial court erred by failing to award her an interest in the 1994 home, by using an improper valuation date of the home, and by failing to find that funds used by defendant from his inheritance to pay off the mortgage were marital assets.

-4-

Again, we review a trial court's factual findings, including the valuation of particular marital assets, for clear error. *Id.* at 355. "The determination of the proper time for valuation of an asset is in the trial court's discretion." *Id.* "If the trial court's findings of fact are upheld, the appellate court must decide whether the dispositive ruling was fair and equitable in light of those facts. The court's dispositional ruling should be affirmed unless this Court is left with the firm conviction that the division was inequitable." *Id.* at 355-356 (quotation marks and citations omitted).

Plaintiff initially asserts that the 2006 home purchased for plaintiff's mother was not a marital asset because it was purchased with asbestos funds that belonged to plaintiff's mother. The trial court, however, found that both homes were marital property because both were purchased during the marriage and both were the responsibility of the parties until they separated. While plaintiff argues that the asbestos money was not marital property, the trial court found that the money from the asbestos disbursements that was spent before the separation was marital property. Plaintiff testified that the asbestos money went into the account of her father's estate, but would sometimes be moved to the parties' joint checking account and was used to benefit both parties. She also testified that the money from the asbestos lawsuit disbursements and their earnings were "all one pot." Testimony clearly demonstrated that the parties used some of that money to pay a portion of the mortgage on the 2006 home. Plaintiff further testified that the parties jointly decided to purchase the 2006 home and that the home was in defendant's name. Defendant testified that the home was purchased so that plaintiff could care for her mother and so it could subsequently be used as an investment. He and plaintiff jointly paid for the utilities and other expenses associated with the home. Accordingly, the trial court did not clearly err by finding that the 2006 home was a marital asset and by setting off the $23,000 plaintiff received from the sale of the 2006 home against the value of the 1994 home.

Plaintiff also argues that the trial court erred by using a valuation date other than the date of divorce for the 1994 home and ignored the fact that the parties continued to pay their bills together and filed joint income tax returns after their separation. Although the only appraisal of the 1994 home admitted at trial was for 2018, the trial court found that it would be inappropriate to use that date to value the 1994 home because the housing market had increased since the time of the parties' separation and because plaintiff had sold the 2006 home in 2014. Plaintiff does not challenge this finding. In addition, the trial court found that the parties manifested an intent to separate their lives in 2013, each paid their own mortgage, and each handled their own maintenance and upkeep. The court further found that, other than health and car insurance, expenses for the children, and their cell phone bill, the parties led completely separate lives. While plaintiff testified that, after their separation, she and defendant agreed to pay certain bills together, including tuition, car insurance, their cell phone bill, and health insurance, she admitted that they each paid their own share. We note that a trial court may "not consider actions on the part of spouses that reflect an intent to lead separate lives when determining what assets comprise the marital estate. However, the court may properly consider manifestations of intent to lead separate lives when *apportioning* the marital estate[.]" *Byington v Byington*, 224 Mich App 103, 113-114; 568 NW2d 141 (1997). Here, the trial court recognized and applied this authority, hence, the trial court did not abuse its discretion by using the 2014 valuation date for the 1994 home.

Finally, plaintiff argues that defendant's use of $98,000 from his inheritance to pay off the mortgage on the 1994 home should have been considered a marital asset. In her trial brief, plaintiff

argued that the assets from defendant's inheritance had been commingled and, therefore, had been transformed into marital property. The trial court found, however, that in 2013, "[p]laintiff abandoned the home and the responsibilities attached to it." Plaintiff does not dispute this finding. Further, plaintiff did not introduce evidence from which the trial court could have concluded that defendant's inheritance constituted a marital asset. There was no evidence that defendant comingled any of the funds with plaintiff. Seemingly the assertion here is premised on defendant using a portion of the inheritance to pay off the mortgage on the 1994 home. Plaintiff does not reveal how that act renders a portion of the inheritance a part of the marital estate. Accordingly, the trial court did not clearly err by finding that the inheritance money used to pay off the mortgage on the 1994 home was not a marital asset.

Using the 2014 valuation date, the trial court found that defendant would have received approximately $20,000 from the sale of the 1994 home. The trial court set off the approximately $20,000 that plaintiff received from the sale of the 2006 home. Accordingly, by awarding defendant the 1994 home, the trial court awarded the parties marital property of approximate equal value. This division was fair and equitable and the trial court did not abuse its discretion.

## C. AXA EQUITABLE ACCOUNT

Next, plaintiff also argues that the trial court's setoff of $120,000 against the AXA Equitable account was inequitable.

As previously stated, we review the trial court's factual findings, including the valuation of particular marital assets, for clear error. *Woodington*, 288 Mich App at 355. "If the trial court's findings of fact are upheld, the appellate court must decide whether the dispositive ruling was fair and equitable in light of those facts. The court's dispositional ruling should be affirmed unless this Court is left with the firm conviction that the division was inequitable." *Id*. at 355-356 (quotation marks and citations omitted).

The trial court found that defendant's AXA Equitable account was marital property, but that plaintiff was not entitled to share in that asset. The trial court found that defendant presented evidence that the account had a balance of $115,454, while plaintiff presented evidence that it had a balance of $124,683. The trial court found that the money was generated in 2011 to 2013 when defendant participated in the DROP program and did not receive a pay check, but instead his income went into this retirement account. At the time of trial, defendant was using the money to supplement his income. The trial court found that it would be inequitable for plaintiff to share this asset because plaintiff had dissipated some marital assets when she left defendant. Testimony revealed that the parties had put $120,000 from the asbestos lawsuit into an account. The money was commingled with the parties' assets and used to pay bills, take trips, and care for their children. The trial court found that this was marital property and plaintiff dissipated that marital asset, at least to the extent of $120,000. Accordingly, the trial court awarded defendant the entire AXA Equitable account. In short, a nearly dollar-for dollar set-off.

Plaintiff argues that the setoff was inequitable because the $120,000 that she took no longer existed and had been used by plaintiff as income. The fact that it no longer existed, however, is irrelevant because the trial court found that plaintiff had taken the $120,000 and dissipated that marital asset. Plaintiff took approximately $120,000 from that account. Thus, $120,000 inured

solely to plaintiff's benefit. While plaintiff claimed that the money was used as income, in reality, there was no evidence regarding how the $120,000 was spent. Therefore, the trial court did not err by awarding defendant the AXA Equitable account, which was worth approximately the same amount as the marital asset dissipated by plaintiff.

## D. NATIONAL WESTERN ANNUITY

Plaintiff argues that the valuation date of the National Western Annuity used by the trial court was clearly inequitable.

"The determination of the proper time for valuation of an asset is in the trial court's discretion." *Woodington*, 288 Mich App at 355. The trial court found that the National Western Annuity was a marital asset and that plaintiff was entitled to 50% of the marital portion of the account with a valuation date of April 1, 2013, when the parties separated.

Plaintiff argues that by using a date other than the date of divorce, the trial court significantly reduced the value of the asset. As discussed earlier, this claim is not supported by the evidence because, although the parties paid some bills together, they each paid their own share. The trial court did not clearly err by finding that the parties manifested an intent to lead separate lives when they separated in 2013. Thus, the trial court did not abuse its discretion by using a 2013 valuation date for the National Western Annuity.

## E. OVERALL PROPERTY DIVISION

Finally, plaintiff argues that the totality of the division of assets was grossly inequitable.

"If the trial court's findings of fact are upheld, the appellate court must decide whether the dispositive ruling was fair and equitable in light of those facts. The court's dispositional ruling should be affirmed unless this Court is left with the firm conviction that the division was inequitable." *Woodington*, 288 Mich App at 355-356 (quotation marks and citations omitted).

While the division of property does not have to be mathematically equal, the division of marital assets was nearly equal in this case. The trial court awarded plaintiff the $120,000 that she took from the joint nest-egg account, the proceeds of the 2006 home totaling approximately $20,000, and half of the marital portion of the National Western Annuity. The trial court awarded defendant his AXA account of approximately $124,683, the marital home for which he would have received a profit of $20,000 in 2014, and the other half of the marital portion of the National Western Annuity. This division was approximately equal in value. The trial court also awarded defendant his pension, which was being used as income, offsetting that award on the basis of plaintiff's ability to earn more than defendant was receiving as income.

With regard to nonmarital assets, the award was not required to be equitable. Plaintiff argues that defendant received several hundred thousand dollars, but the trial court properly held that money was his own separate property. Moreover, plaintiff also had a substantial amount of her own money, primarily from the asbestos lawsuit disbursements. Plaintiff was awarded her Prism account of $23,000, her IRA with approximately $6,000, as well as all asbestos lawsuit disbursements received after 2013. The trial court found that the total amount disbursed from the asbestos lawsuit was at least $613,869.86, but $219,917.16 was received before plaintiff's mother

died and $164,356 was used by the parties jointly. Accordingly, plaintiff received at least $100,000, not including the $120,000 she took from the nest-egg account. Defendant was awarded his Core Cap Investment of $98,629 and the Azouri Investment of $230,000, which were purchased with funds from the inheritance. He also received the nonmarital portion of the National Western Annuity.

For the reasons discussed above, the trial court's factual findings are not clearly erroneous. The trial court's dispositional ruling was fair and equitable in light of those findings.

Affirmed. We decline to award costs. MCR 7.219(A).

/s/ Brock A. Swartzle
/s/ Kathleen Jansen
/s/ Stephen L. Borrello